**Donald F. HALL and Mary Ann Hall, et al., Plaintiffs,**

v.

**BABCOCK & WILCOX COMPANY, et al., Defendants.**

No. Civ.A. 94–951.

United States District Court, W.D. Pennsylvania.

June 29, 1999.

---

Frederick M Baron, Baron & Budd, Dallas, TX, William Caroselli, Caroselli Spagnoli & Beachler, Pittsburgh, PA, for plaintiffs.

AH Wilcox & Ellen Kittredge Scott, Pepper Hamilton LLP, Philadelphia, PA, George Medved, Pepper Hamilton LLP, Pittsburgh, PA, Neal R Brendel, Kirkpatrick & Lockhart, Pittsburgh, PA, Robert C Heim, Dechert Price & Rhoads, Philadelphia, PA, Lee M Epstein, Anderson Kill & Olick PC, Philadelphia, PA, Barry Ostranger, Simpson Thacher & Bartlett, New York City, Jon Hogue, Hogue & Lannis, Pittsburgh, PA, for defendants.

## OPINION and ORDER OF COURT

AMBROSE, District Judge.

Plaintiffs instituted this "public liability action" against Defendants claiming that radiation released from Defendants' nuclear fuel fabrication facility in Apollo caused them to develop cancer. After a jury trial, a verdict was entered in favor of all Plaintiffs and against both Defendants.

Pending is Defendants' Motion for Judgment as a Matter of Law, or in the Alternative, for a New Trial (Docket No. 355). After careful consideration of the parties' submissions and the record, the Motion for Judgment as a Matter of Law is denied and the Alternative Motion for a New Trial is granted for the following reasons.

### A. *Motion for Judgment as a Matter of Law.*

#### (1) **Evidence of violation of 10 C.F.R. § 20.106.**

■ Turning first to Defendants' Motion for Judgment as a Matter of Law, Defendants argue that they are entitled to judgment as a matter of law because Plaintiffs produced no admissible evidence that the concentrations of uranium in the air violated 10 C.F.R. § 20.106.

Prior to trial, Defendants filed a Motion for Summary Judgment concerning this very issue. They argued that Plaintiffs had produced no evidence pre-trial that releases from the Apollo facility violated § 20.106 at the boundary of the restricted area and that, therefore, Plaintiffs would be unable to prove a violation of the federal standard of care, i.e., the limits imposed by § 20.106. In the Opinion denying Defendants' Motion for Summary Judgment, the Magistrate Judge (whose Opinion I adopted) pointed to internal documents from Defendants' files which created a genuine issue of material fact as to whether § 20.106 had been violated. At trial, these same documents and others were introduced, as well as other evidence, from which a jury could find a violation of the applicable standard of care.

10 C.F.R. § 20.106 provides as follows:

a) Licensees "shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in appendix B, Table II of this part, except as authorized pursuant to § 20.302 or paragraph (b) of this section. For purposes of this section concentrations may be averaged over a period of not greater than one year."

b) An application for a license amendment may include proposed limits higher than those specified in paragraph (a) of this section. The Commission will approve the proposed limits if the applicant demonstrates:

> 1) That the applicant has made a reasonable effort to minimize the radioactivity contained in effluents to unrestricted areas; and

> 2) That it is not likely that radioactive material discharged in the effluent would result in the exposure of an individual to concentrations of radioactive material in air or water exceeding the limits specified in Appendix "B," Table II of this part.

c) An application for higher limits pursuant to paragraph (b) of this section shall include information demonstrating that the applicant has made a reasonable effort to minimize the radioactivity discharged in effluents to unrestricted areas . . .

d) For the purposes of this section the concentration limits in Appendix "B," Table II of this part shall apply at the boundary of the restricted area. The concentration of radioactive material discharged through a stack, pipe or similar conduit may be determined with respect to the point where the material leaves the conduit. If the conduit discharges within the restricted area, the concentration at the boundary area may be determined by applying the appropriate factors for dilution, dispersion, or decay between the point of discharge and the boundary.

During the trial, there was no lack of evidence from Plaintiffs' experts that Defendants had violated § 20.106. The testimony of Dr. Egilman, Mr. Franke and Dr. Makhijani repeatedly offered opinions that § 20.106 had been violated by Defendants. Dr. Egilman's expert report, produced pre-trial, contained numerous references to standard violations by Defendants. His testimony at trial echoed his pre-trial disclosures. N.T. (8/11) at pp. 146, 160, 166–69, 180, 184–84, 189–90. Mr. Franke testified to "totally insufficient" data compiled by Defendants both at the stacks and at the roof edges. He did however, see sufficient data to enable him to opine that § 20.106 was violated. N.T. (8/19) 6: 107, 113, 117, 120. Dr. Makhijani testified as to Defendants' noncompliance with the monitoring conditions of the license to operate the facility, the "sorely inadequate" data compiled by Defendants, and the likelihood of high release events that were not monitored. Nevertheless, he, too, stated that what data existed was sufficient to determine that Defendants violated § 20.106. N.T. (8/12) 2: 173.

Furthermore, Defendants' internal documents, produced pre-trial, were also introduced at trial as evidence that Defendants breached the applicable standard of care. Plaintiffs' Exhibit 13, a letter dated February 15, 1969, from the Atomic Energy Commission (AEC) to NUMEC, states that NUMEC's own data demonstrated release of radioactive materials through the stacks to *unrestricted* areas in amounts exceeding the limits of 10 C.F.R. § 20.106.

Plaintiffs' Exhibit 4, a letter from NUMEC Health and Safety Manager R.V. Barry to the AEC, admits a violation of § 20.106 "at the property line when the winds are from the south quadrant." Plaintiffs' Exhibits 47, 51, 52, 54, 55 and 56, are internal documents from Apollo plant officials written between August 1967 and March 1968, all of which indicate releases into *unrestricted* areas exceeding the limits of § 20.106.

The thrust of Defendants' arguments, therefore, is not that there was no evidence of violations of § 20.106, but, rather, as Plaintiffs point out, that there was no admissible evidence of such. Defendants argue that the only evidence introduced at trial related to measurements taken of emissions from the stacks into the restricted roof top area and that no measurements were taken at the boundary of the restricted area, the site governed by § 20.106. Defendants contend that the failure of Plaintiffs' experts to do a dispersion analysis renders their testimony relating to § 20.106 inadmissible. Notably, Defendants do not discuss the internal documents which express the conclusion that § 20.106 was violated based on measurements of stack emissions into unrestricted areas.

After reviewing again the testimony of Plaintiffs' experts and the exhibits introduced at trial relating to this issue, I conclude that Defendants' position is without merit. First of all, Defendants' main premise (that the rooftop of the facility is a restricted area) is not as clear as Defendants would have me believe. Plaintiffs have attached as Exhibit A to their Brief in Opposition to Defendants' Motion, a June 5, 1964 letter from the AEC to NUMEC which concludes that the roof area is an unrestricted area. If that is, in fact, the case, then there can be no question of the sufficiency of evidence at trial to support a conclusion that § 20.106 was violated. While it may be true that the NRC has clarified that limits for radioactive emissions apply at the boundary of the restricted area and not at stack discharge points, this assumes that the stack discharges into a restricted area. Nevertheless, the internal documents, the correspondence with the AEC and the testimony of Plaintiffs' expert witnesses all were sufficient admissible evidence and supported the jury's conclusion that § 20.106 was violated.

Furthermore, since it was without dispute that Defendants' monitoring was inadequate, at best, it would be most unfortunate if Plaintiffs were made to bear the

burden of Defendants' past noncompliant action with regard to monitoring.

**(2) Plaintiffs' Causation Expert Witnesses.**

 Defendants next argue that they are entitled to judgment as a matter of law because not one of Plaintiffs' three causation expert witnesses gave credible testimony that exposure to radiation was a substantial factor in bringing about Plaintiffs' cancers. Specifically, Defendants contend that because Plaintiffs' expert witnesses on causation did not base their testimony as to causation on the specific dose a Plaintiff might have received from the radiation emissions, the opinions on causation were given without sufficient foundation and were inadmissible as a matter of law.

As will be more fully discussed within, Plaintiffs' causation experts, Drs. Melius and Radford employed a differential diagnosis methodology in arriving at their opinions. Differential diagnosis is a methodology used to determine causation of a disease suffered by an individual, based on efforts to consider and exclude all possible alternate causes. As set forth by the Court of Appeals in *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997) and *In re Paoli Railroad Yard PCB Litig.* ("Paoli II"), 35 F.3d 717 (3d Cir. 1994), the admissibility requirements of causation testimony in this case were met. Dr. Radford examined many factors in each Plaintiff's background. Additionally, he reviewed and used the information arrived at by Plaintiffs' dosimetry experts. As set forth more fully within, Radford's differential diagnosis evaluated all available information about each Plaintiff, determined the "most likely" diagnosis and tested the hypothesis by considering other possible diagnoses. His conclusions were scientifically reliable and sufficient to meet Plaintiffs' burden of establishing causation.

In the same manner, Dr. Melius also employed a differential diagnosis methodology. The arguments Defendants make about his testimony are essentially the same as those made about Dr. Radford

and his opinions. Dr. Melius also relied on dose information provided by other experts; considered all factors relating to each Plaintiff which may have increased their susceptibility to the risks associated with radiation exposure; and eliminated other potential causes of Plaintiffs' cancers based on a thorough review and examination of all available data. This is what a differential diagnosis is and it was an appropriate and sound methodology on which this expert based his opinion.

While not as specific as the testimony of Drs. Radford and Melius, Dr. Egilman's testimony and expert opinions on general causation clearly "fit" the facts of this case. His opinions that radiation causes cancer and that there is no safe level of radiation exposure were helpful in assessing other expert opinions and were not inadmissible because they failed to address specific causation as to each Plaintiff.

**(3) Reasonable Degree of Medical Certainty.**

 Finally, Defendants contend that they are entitled to judgment as a matter of law because the causation opinions of Drs. Radford and Melius were not given to a "reasonable degree of medical certainty." Defendants point to a question to Dr. Melius asking if his opinions were given with "reasonable medical scientific probability." N.T. (August 18) at p. 56. Dr. Radford was asked to opine on "what more likely than not caused the cancers in the eight people." N.T. (August 17) at pp. 153–54. Defendants point out other instances where Plaintiffs' experts gave opinions "based on reasonable medical probability, N.T. (August 17) at pp. 7, 58; based on reasonable medical scientific probability;" N.T. (August 18) at pp. 48, 49, 50; as to what "more likely than not" caused Plaintiffs' injuries, N.T. (August 17) at p. 153; and an opinion based on "more likely than not reasonable medical probability." N.T. (August 17) at p. 7.

In response, Plaintiffs suggest that what is important in determining whether the

experts' opinions were sufficiently certain to satisfy the requirements of the law is the totality of the testimony. Plaintiffs argue that both Doctors Melius and Radford were sufficiently certain to satisfy the requirements of the law.

■ Under Pennsylvania law, expert testimony need not be expressed in precisely the language used to enunciate the legal standard. *Hoffman v. Brandywine Hosp.*, 443 Pa.Super. 245, 661 A.2d 397 (1995). In fact, a reviewing court is required to consider expert testimony in its entirety to determine whether an opinion has been expressed with a reasonable degree of medical certainty. *McCann v. Amy Joy Donut Shops*, 472 A.2d 1149, 1151, 325 Pa.Super. 340 (1984).

After reviewing the record and, in particular, the testimony of Drs. Radford and Melius as to causation, I find that their testimony, reviewed in the entirety, was given with the requisite degree of medical certainty. For example, Radford did use the term "reasonable medical certainty" to describe his opinion (N.T. 8/17 58–59, 152) and said he had "no real doubt" (N.T. 8/17, 7). Melius stated his opinions as "firm conclusions." (N.T. 8/18, 166.) Their testimony was sufficiently firm, certain and unequivocal on the issue of causation.

## B. *Motion for a New Trial.*

Defendants have additionally argued that substantial errors were made with respect to the admission of evidence and jury instructions and that such errors require that a new trial should be granted. Reluctantly, considering the time, expense, effort and emotion already invested in this case by all involved, I find that the admission of certain evidence in the trial, as set forth within, requires that Defendants' Motion for a New Trial must be granted.

### (1) Plaintiffs' Exhibits 37 and 38.

I begin with Defendants' argument that Plaintiffs' Exhibits P–37 and P–38 were inadmissible. Plaintiffs offered these exhibits in conjunction with the testimony of Dr. Melius to demonstrate an increase in cancer in Apollo as compared to surrounding communities.

■ Defendants have challenged the admission of these exhibits and the testimony concerning them on a number of bases. Defendants allege that, contrary to the mandate of Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, the exhibits were not attached to or included in Melius' report nor were they referenced in any way therein and that, therefore, their admission at trial, constituted error requiring a new trial.

While Plaintiffs do not dispute that the exhibits were not attached to or included in the pretrial disclosures, Plaintiffs argued at trial, and presently, that Dr. Melius' report and his deposition testimony adequately alerted Defendants to the opinions he gave with respect to P–37 and P–38. Upon further review, I find now that I disagree with Plaintiffs and that the exhibits should not have been admitted into evidence at trial and Dr. Melius should not have been permitted to testify as to any analysis based on the data contained therein.

In 1996 the Pennsylvania Department of Health published the "Apollo–Parks Cancer Incidence Study 1984–92," a study conducted because of residents' concerns about the health of persons residing near the Apollo and Parks Township nuclear facilities. The study found the risk for all cancers "slightly elevated" in residents of communities within close proximity the Apollo nuclear facility and concluded that there was no elevation in the rates of cancers sensitive to radiation. The study was based on data from 1984–92, attached to the study in two tables (Table 7, comparing Apollo data with national norms and Table 8, comparing the same data with state norms). This data was validated by the author of the study, Dr. Eugene Weinberg, an epidemiologist with the Pennsylvania Department of Health. The study made no comparison between cancer rates in the Apollo area and areas surrounding that community. In validating the data,

Dr. Weinberg reviewed each reported case of cancer and ascertained each specific place of residence.

During the testimony of Plaintiffs' experts, Dr. Radford and Dr. Melius, Plaintiffs' counsel offered testimony from those experts in conjunction with the two (2) exhibits, P–37 and P–38, which purported to show a marked excess of incidence of cancer in the Apollo community compared to surrounding communities. As the parties now agree, P–37 and P–38 are charts drawn from raw data contained in the State Health Data Center Statistics for 1990–94. Unlike the Department of Health Study, this raw data was not validated nor verified by Dr. Weinberg or anyone else for precise residence. As counsel for Defendants correctly point out, Exhibits P–37 and P–38 were not disclosed pre-trial, either in Plaintiffs' expert reports or at any deposition of Plaintiffs' experts.

Nevertheless, during Dr. Radford's testimony, P–37 and P–38 were displayed to the jury. Defendants objected and Plaintiffs responded that the information contained in the exhibits had been provided in Radford's report. After Plaintiffs' counsel's failure to provide support for their assertion that the information and data contained in P–37 and P–38 had been included in Radford's report, Radford's testimony concerning P–37 and P–38 was stricken.

P–37 and P–38 resurfaced during the testimony of Plaintiffs' expert, Dr. Melius. Again Defendants argued that the exhibits were inadmissible as they had not been disclosed prior to trial. Again Plaintiffs represented that the material contained in the exhibits had been included in Dr. Melius' expert report and that disclosure of the information had been made in Dr. Melius' deposition.

More specifically, Plaintiffs' counsel represented, or misrepresented, that the data contained in P–37 and P–38, was data which Melius reviewed and which came with the Department of Health study pertaining to 1984–92 and "related documents," which had been disclosed to Defendants. Dr. Melius indicated that in reaching his opinions as to causation, he had reviewed the epidemiological study performed by the Department of Health. At trial, he opined that the study found a significantly increased incidence of cancer in the Apollo area and demonstrated this opinion through P–37 and P–38. Although Plaintiffs' counsel led me to believe that this opinion was formed from review of data provided in documents related to the Department of Health Study and previously disclosed to Defendants, it is clear to me now, from a careful review of the documents, that such was not the case. In fact, as stated above, the information used in preparing P–37 and P–38 was drawn from raw, unverified and unvalidated data contained in the State Health Data Center statistics covering 1990–94. Even though Plaintiffs' counsel argues that the "related documents" to which Dr. Melius referred in his report and testimony covered the raw, unverified and unvalidated data from the State Health Data Center, covering 1990–94, that data was not attached to, included in, or in any way mentioned in Dr. Melius' report. Moreover, that data was not referenced in Dr. Melius' report nor in his deposition testimony, even though it was the very data he relied on in reaching the opinions he testified to at trial based upon data set forth in P–37 and P–38.

As Defendants' counsel points out on page 38 of the Memorandum of Law in Support of Defendants' Motion … for a New Trial, "the Pennsylvania Department of Health Study is a different document, [from the State Health Data Center Statistics, covering 1990–94], involving different data and which reached exactly the opposite conclusion from that which Melius told the jury was true." Defendants' representation is correct and Plaintiffs' counsel's unequivocal representations at trial that the material had been disclosed were not correct.

At the trial when the exhibits were sought to be admitted, I was persuaded by sections of Dr. Melius' deposition testimony that, in addition to the Pennsylvania Department of Health study, he had reviewed additional tables provided by the Department of Health *and* was further persuaded by Plaintiffs' counsel's representations that the additional tables referred to were supplied to Defendants and contained the State Health Data Center statistics covering 1990–94. However, when presented now with the remainder of Dr. Melius' deposition, in which he specifically denies performing any analyses of the types represented in P–37 and P–38, I find that the additional tables referenced by Melius were not those containing the statistics covering 1990–94 and that there was *nothing in Melius' report or deposition* testimony which could have alerted Defendants to the conclusions reached in P–37 and P–38 and the opinions he expressed based on those exhibits.

Thus, I conclude that Plaintiffs' Exhibits P–37 and P–38 and the testimony based on them, should have been excluded because neither the exhibits themselves nor the information and conclusions contained in them were disclosed prior to trial. Rules 26(a)(2)(B) and 37(c)(1) were violated.

■ Moreover, I cannot conclude, as Plaintiffs urge, that the admission of P–37 and P–38 and testimony based thereon was harmless error because the exhibits and testimony simply summarized the data found in documents listed in Plaintiff's pretrial exhibit list. The testimony was highly prejudicial. The exhibits dramatically bolstered Plaintiffs' theory of causation and they bolstered Plaintiffs' theory with analyses, statistics and expert opinions which were undisclosed prior to their admission at trial. The admission of this considerable and unjustified variance between Melius' report and deposition testimony and his testimony at trial was error requiring a new trial.

## (2) **Methodology of Plaintiffs' Causation Experts.**

■ Defendants additionally contend that the Court erred in refusing to exclude various of Plaintiffs' experts from testifying because their methodology and conclusions were scientifically unreliable and thus inadmissible pursuant to the opinion of the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). This Court is guided by the principles set forth in *Daubert,* and by the Third Circuit Court of Appeals in *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717 (3d Cir.1994). These cases require that the proponent of evidence show that experts' conclusions have been arrived at in a scientifically and methodologically reliable form.

In *Daubert* the Court established a nonexhaustive list of criteria for courts to consider when determining the reliability of expert testimony. These include whether the expert's methodology is testable and has been tested, peer review and publication, the known or potential rate of error, the existence and maintenance of standards controlling the technique's operation, and acceptance in the relevant scientific community, 509 U.S. at 593–94, 113 S.Ct. 2786. *In Paoli II,* the Court of Appeals set forth three (3) additional factors for courts to consider, including the degree to which the expert is qualified, the relationship of a novel technique to more established modes of scientific analysis, and the non-judicial uses to which the scientific output are put. 35 F.3d at 742.

Prior to the inception of trial, I conducted a careful review of Defendants' Motions in Limine, Plaintiffs' responses thereto, and an independent review of the expert reports at issue which were attached to Plaintiffs' pre-trial statement. I concluded that the proposed expert testimony as set forth in the reports met the requirements of *Daubert* and *Paoli II.*

In the post-trial Motion, Defendants specifically argue that the proffered testi-

mony of Drs. Egilman, Radford and Melius as set out in their expert reports should have been excluded because their methodology and conclusions were scientifically unreliable and, thus, inadmissible under *Daubert.*

■ As to Dr. Egilman and the Motion in Limine seeking to exclude his testimony, I based my conclusion to allow him to testify on the following. Dr. Egilman is a board-certified physician in the following disciplines: internal medicine, environmental medicine, and occupational medicine (the diagnosis and treatment of problems related to exposure to chemicals and other substances). He has formal training as well in health physics, hematology, radiology and oncology. Dr. Egilman has been retained by corporations and unions to assist in developing health surveillance networks in workplaces, including nuclear facilities. He has testified before Congress on the issue of medical ethics and corporate responsibility concerning the use of radiation and radioactive materials. Thus, Dr. Egilman was clearly qualified to render expert opinions.

Defendants sought pre-trial to exclude Dr. Egilman's testimony summarizing the medical methodology used to determine causation and analyzing the health and safety practices of Defendants.

As to causation, Defendants argued pre-trial that Dr. Egilman in his report did not address specific causation, that is, whether releases from the Apollo plant caused Plaintiffs' specific cancers. Consequently, Defendants argued, Dr. Egilman's testimony as to causation undermined the specific causation analyses of Plaintiffs' other causation experts, Drs. Radford and Melius. Defendants further argued that Dr. Egilman's "probabilistic" analysis diminished the importance of epidemiology, discounted established principles for evaluating causal relationships and did not consider the effects of low doses of radiation and other types of radiation exposure.

These arguments, however, did not persuade me that Dr. Egilman's causation testimony should be excluded. The purported purpose of Dr. Egilman's causation testimony was to demonstrate that radiation causes cancer and that there is no safe level of radiation exposure.

Plaintiffs and Defendants agree that Dr. Egilman's report dealt largely with general, as opposed to, specific causation. From this area of agreement, however, Defendants concluded that the proffered testimony would not assist the trier of fact. With this conclusion, I did not agree pre-trial and do not agree now. The holdings of *Daubert & Paoli II* do not exclude testimony on this basis. Certainly, evidence that radiation exposure causes cancer was relevant to this case and did assist the jury. As to whether or not Dr. Egilman's testimony undermined the testimony of Plaintiffs' other experts, I concluded pre-trial and conclude now that this was an issue to be resolved by the trier of fact. With regard to Defendants' criticism of the methodology used by Dr. Egilman, the doctor did complete a three (3) year residency with the National Institute of Occupational Safety and specialized in epidemiology. This satisfies the credential qualification requirement of *Paoli II*. Furthermore, although Defendants argued that Dr. Egilman misused and gave too much weight to a probabilistic analysis, Defendants did not argue and have offered no support that such an analysis was unaccepted in the scientific community or that it was a novel technique. Finally, as to his causation testimony, Dr. Egilman's several publications on the effects of radiation and exposure to radioactive materials and his testimony before the President's Advisory Committee and United States House of Representatives provided the opportunity for sufficient review and publication of his work to render his testimony on causation admissible. Dr. Egilman was qualified to give an opinion on general causation. The opinions were reliable and his testimony was certainly helpful to the jury as it clearly "fit" the facts of this case.

Dr. Egilman's report also indicated that he would testify to the health and safety

practices of Defendants and, in fact, he testified that Defendants' conduct in this regard was reckless. I concluded pre-trial and conclude now that Dr. Egilman was qualified to give testimony on Defendants' health and safety practices. Dr. Egilman's special knowledge and training in occupational medicine and his assistance to corporations on health and safety issues qualified him to give these opinions. Dr. Egilman's proffered testimony indicated that he had reviewed documents produced by Defendants relating to emissions from the Apollo plant and had concluded that the safety practices at that plant were not designed to prevent the loss of uranium from the plant's stacks. His experience and special training rendered him competent to arrive at his conclusions by reviewing Defendants' documents. Thus, his testimony on health and safety issues was also admissible as he was well-qualified to give such opinions which were reliable and helpful to the jury.

 As to Dr. Radford and the Motion in Limine seeking to exclude his testimony, I based my conclusion that his proffered testimony as set forth in his expert report met the requirements set forth in *Daubert* and *Paoli II,* on the following.

Using a differential diagnosis methodology, Dr. Radford rendered an opinion that releases of radionuclides from the Apollo plant caused Plaintiffs' cancers.

Differential diagnosis is a methodology which has been recognized as a technique from which reliable opinions may be formulated. *Paoli II* and *Kannankeril, supra.* Therefore, in reviewing Radford's proffered testimony, as set forth in his pretrial report, my pre-trial examination focused not on the validity of a differential diagnosis methodology but, rather, on the sufficiency of Radford's technique to provide a reliable basis for his opinions. In his report, Radford indicated that the evidence he looked at to reach his conclusions was: (1) the type of cancer; (2) the age at diagnosis for the Plaintiffs' cancers as compared to the average age at which the specific type of cancer appeared in the

local area in the years 1985–89; (3) other risk factors present in the Plaintiffs' backgrounds; and (4) whether the Plaintiffs grew their own food (because a primary hypothesized source of exposure was ingestion of radiation deposited on soil).

Pre-trial, Defendants contended that Radford should be excluded from testifying for two (2) reasons. First, Defendants argued that Radford could not explain or qualify how he concluded that all the Plaintiffs received some unquantified "significant exposures" to cause their cancers and that unquantified, unsubstantiated assertions of significant exposures could not serve as the basis for an expert opinion. The Defendants argued that admission of such testimony would allow the jury to speculate as to whether the exposure was sufficient to cause the Plaintiffs' injuries. Furthermore, on this point, Defendants urged that the unquantified estimates proposed by Radford were unscientific and unreliable and led to result-oriented analysis and conclusions.

Plaintiffs countered this argument by pointing to Radford's review and use of information from Plaintiffs' dosimetry experts who ultimately determined that the radiation exposure to the Plaintiffs was substantial. Plaintiffs also point to documents reviewed by Radford, containing information demonstrating Defendants' failure to adequately monitor the radioactive materials being emitted from the Apollo plant, making precise quantification impossible.

Defendants also argued pre-trial that Radford's methodology was unreliable in that: (a) his method of comparing the age of diagnosis for the small number of test case Plaintiffs to the average age of diagnosis for the local population between 1985 and 1989 is not generally accepted in the scientific community that studies the health effects of radiation; (b) Radford himself had never introduced the age-of-diagnosis method into scientific discourse through publication in peer-reviewed journals (or otherwise) or academic lectures

and has only used the method one other time, again for litigation purposes; (c) the age-of-diagnosis method had not been tested by others; (d) the rate of error and potential bias in using the age-of-diagnosis method is great because (1) Radford's study design provides no basis for concluding that the Plaintiffs' ages at the time of their diagnoses had any relationship to their proximity to the Apollo plant, (2) Radford did not develop a selection criteria but rather, abdicated that role to Plaintiffs' counsel, who chose the eight (8) Plaintiffs, (3) Radford only used data from 1985–89 for the control group when there were also numbers available for the years 1990–95, when only four (4) of the eight (8) Plaintiffs were diagnosed, (4) Radford's use of the local population statistics was an inapposite basis for comparison because those statistics represented the same population from which allegedly exposed Plaintiffs were drawn, (5) Radford's conclusion that seventy-five (75%) percent (three of four) breast cancer plaintiffs were diagnosed before age fifty-five (55) and that such a number is statistically significant was speculative and untested; (e) Radford did not calculate the risk of cancer from a given dose; and (f) Radford's reference to individual susceptibilities as a component of his analysis was nothing more than an unproven hypothesis and not scientific knowledge which would assist a trier of fact.

Summarizing their argument that Radford's methodology was unreliable, Defendants contend that absent an evaluation of causation by means of an assessment of dose and the risk attendant to that dose for a particular Plaintiff, Radford's conclusions and opinions were inadmissible.

Plaintiffs countered Defendants' objections to Radford's methodology, arguing that he used the standard and reliable differential diagnosis method and not an age-at-diagnosis comparison. Rather, Plaintiffs assert that Radford's discussion of the age-at-diagnosis comparison was not part of his methodology, but merely support for his judgment that radiation should be "ruled-in" as a potential cause for Plain-

tiffs' cancers. I agreed with Plaintiffs pretrial and agree now. A differential diagnosis methodology was employed by Radford and involved an evaluation of all available information about each Plaintiff, a determination of the most likely diagnosis and a testing of this hypothesis by considering other possible diagnoses. Dr. Radford reviewed records of the Apollo plant operation, Plaintiffs' medical records, population statistics for communities in and around Apollo, cancer data for those communities, the dosimetry calculations of Plaintiffs' dose experts, the Plaintiffs' deposition transcripts, the Plaintiffs' treating physicians' depositions, information about Plaintiffs' diets, school and work locations, the Department of Health's 1996 report on cancer incidence in Apollo–Parks from 1984–1992, epidemiological data which explored the biological effects of radiation and scientific literature which examined the mechanisms of development of human cancers, including cancer induction by radiation exposure and evidence of individual susceptibility to cancer. This review and evaluation convinced me pre-trial, and continues to convince me now, that Dr. Radford properly performed a differential diagnosis and employed sufficient diagnostic techniques to support his opinions on causation.

Although Defendants also argued that Radford did a haphazard assessment of other risk factors and based that assessment on incomplete data, Radford's report made it clear that he did take into account other risk factors and discounted them.

Despite Defendants' arguments pertaining to the admissibility of Radford's testimony based on the content of the report, I concluded that Radford's differential diagnosis testimony relating to causation was scientifically reliable, did meet the requirements of *Daubert* and *Paoli II* and would assist the trier of fact. Defendants' arguments were more properly the basis for cross-examination and the record of the trial reveals a vigorous cross-examination by Defendants' counsel which gave the

jury opportunity to fairly evaluate Radford's testimony.

■ As to Dr. Melius and the Motion in Limine seeking to exclude his proffered testimony set forth in the expert report, I based my conclusion to allow him to testify on the following. In their Motion, Defendants contend that Dr. Melius' opinion regarding causation contained major flaws: that his opinions did not "fit" the facts because the record failed to establish that each Plaintiff had a "significant" exposure of radiation; that his opinions were not based on scientific knowledge derived from a reliable scientific methodology; and, that his opinions were uninformed, unreliable and so result-oriented that they should have been excluded.

Plaintiffs countered Defendants' objections by arguing that Dr. Melius performed a differential diagnosis methodology, that his opinions based on this methodology were scientifically acceptable and reliable and that his opinions were of assistance to the jury.

I agreed with Plaintiffs' pre-trial and continue to agree that Dr. Melius' testimony, as set forth in his expert report, was admissible.

Upon examination and review of the pre-trial submissions of the parties relating to Dr. Melius' testimony, I find that the methods employed by Dr. Melius in conducting a differential diagnosis were reliable. Dr. Melius evaluated the exposure of each Plaintiff by reference to the dose estimate provided by Plaintiffs' dose experts. He considered the distance each Plaintiff lived from the Apollo facility, activities that may have influenced their exposure, their diets and food sources.

In addition to these factors, Dr. Melius reviewed the epidemiological study of cancer incidence in the Apollo area performed by the Pennsylvania Department of Health. He reviewed scientific literature on radiation exposure and cancer incidence, with particular emphasis on literature regarding the association between radiation exposure and the cancers contracted by the Plaintiffs. He considered genetic factors and exposure to other risk factors which may also increase susceptibility to the risks associated with radiation exposure.

After taking into account all of these factors, Dr. Melius eliminated other potential causes of the Plaintiffs' cancers by reviewing each Plaintiff's medical and occupational history. He performed a comprehensive review of each Plaintiff's medical records, medical histories, depositions, answers to interrogatories, depositions of family members and treating physicians and Plaintiffs' answers to questions about activities and dietary habits which might have exposed them to emissions from the Apollo facility. After consideration of all potential risk factors and through the exercise of his professional judgment, Dr. Melius concluded that radiation exposure from the Apollo facility was the most likely cause of Plaintiffs' cancers.

As to Dr. Melius' employment of the "differential diagnosis" methodology in his determination that radiation from the Apollo facility was most likely the cause of Plaintiffs' illnesses, the Third Circuit court has held that courts must be flexible in conducting a *Daubert* inquiry when assessing the scientific reliability of this particular methodology. *Paoli II* at 758. The *Paoli II* court explained that although "differential diagnosis is generally a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results, it is a method that involves assessing causation with respect to a particular individual." *Id.* As a result, no particular combination of techniques chosen by a doctor evaluating an individual patient is likely to have been accepted, published, or subjected to peer review analysis. *Id.* Therefore, the Court decided that "performance of physical examinations, taking of medical histories, and employment of reliable laboratory tests all provide significant evidence of a reliable differential diagnosis, and that their absence makes it much less likely

that a differential diagnosis is reliable." *Id.* (*see Also Hines v. Consolidated Rail Corp.*, 926 F.2d 262 (3d Cir.1991)).

While the *Paoli II* court held that a doctor does not always have to employ all of these techniques in order for his differential diagnosis to be reliable, "to the extent a doctor utilizes standard diagnostic techniques in gathering medical information, the more likely the court is to find that the doctor's methodology is reliable." *Paoli II* at 758.

Nor is reliability of expert testimony diminished because, as Defendants have argued, the physician performing a differential diagnosis did not personally perform the medical examinations. Rather, evaluation of a patient's medical records is "a reliable method of concluding that a patient is ill even in the absence of a physical examination. A doctor need only one reliable source of information showing that a patient is ill; either a physical test or medical records will suffice for this." *Kannankeril v. Terminix Int., Inc.*, 128 F.3d 802, 807 (3rd Cir.1997) citing *Paoli II* at 762.

As I have reviewed Dr. Melius's methodology as set forth above and the dictates of the law, I find that Dr. Melius' testimony, as set forth in his report, is reliable. Furthermore, the *Paoli II* court held that in attacking a differential diagnosis performed by a plaintiff's expert, a defendant may point to a plausible cause of the plaintiff's illness, other than the defendants' actions. It then "becomes necessary for the plaintiffs expert to offer a good explanation why his or her conclusion remains reliable." *Paoli II* at 762. The Defendants, however, neither challenged the Plaintiffs with alternate diagnoses by other physicians nor raised any other theory of causation to explain Plaintiffs' illnesses.

Notwithstanding the absence of other theories of causation, I found and continue to find that Dr. Melius' proffered testimony as set forth in his expert report, is informed, not result-oriented, based on scientific knowledge derived from a reliable scientific methodology and "fits" the facts of this case.

### (3) Plaintiffs' Exhibits 3, 4, 7, 10, 16, 18, and 19 and Dr. Egilman's testimony.

Defendants next allegation of error which they contend mandates a new trial, concerned Dr. Egilman's testimony as to Plaintiffs' Exhibits 3, 4, 7, 10, 16, 18 and 19, which were not previously listed in Dr. Egilman's report. Plaintiffs admit that the exhibits were not disclosed in Dr. Egilman's report, but contend that the nondisclosure was harmless because the seven exhibits were documents which contained the same information as various other documents admitted into evidence at trial, which had been disclosed pre-trial.

Accepting Plaintiffs' representations as true and having already determined that a new trial is necessary because of the error in admitting Plaintiffs' exhibits 37 and 38, I find that both Plaintiffs' and Defendants' objectives would be served by the exclusion of these exhibits at the next trial. Plaintiffs have no need to introduce duplicative evidence and Defendants will suffer no surprise.

### (4) 10 C.F.R. § 20.105.

Defendants also contend that a new trial is required because the Court erred in instructing the jury and admitting evidence pertaining to 10 C.F.R. § 20.105. 10 C.F.R. § 20.105 provides:

*10 C.F.R. 20.105:* Applications for licenses to possess, use or transfer special nuclear materials will be approved only if the license applicant demonstrates that radiation levels in unrestricted areas "are not likely to cause any individual to receive a dose to the whole body in any period of one calendar year in excess of 0.5 rem (500 millirem)," and

No licensee "shall possess, use or transfer licensed material in such a manner as to create in any unrestricted area from radioactive material and other sources of radiation in his possession:

1) radiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of two millirems in any one hour, or

2) radiation levels which, if an individual were continuously present in the area, could result in his receiving a dose in excess of 100 millirems in any seven consecutive days."

Defendants contend that § 20.105 was irrelevant to Plaintiffs' claims because it concerns restrictions on the levels of direct radiation permitted to emanate from a stationary source, which was not a matter at issue in this trial. Rather, Defendants argue, Plaintiffs were concerned with whether the concentration of uranium at the boundary of the restricted area violated § 20.106 and claimed injuries only from violation of § 20.106.

Plaintiffs rely exclusively on the language contained in *In re TMI,* 67 F.3d 1103 (3d Cir.1995) in which the Court of Appeals held that the federal standard of care in public liability actions was governed by § 20.105 and § 20.106 and that "the duty of care is measured by whether Defendants released radiation in excess of the levels permitted by §§ 20.105 or 20.106, as measured at the boundary of the facility...." *Id.* at p. 1117–18.

Admittedly, Plaintiffs claimed no injuries from violation of § 20.105. Given that admission, I do not now read *In re TMI, supra,* to require no connection between a regulatory violation and the injuries claimed. Rather, I agree with Defendants that the language of *In re TMI* must be read in conjunction with the facts of that case, wherein Plaintiffs claimed injury resulting from exposure to radiation levels in violation of both §§ 20.105 and 20.106. There must be a causal relationship between the injuries allegedly sustained and the violation of the regulation at issue. Without a connection to Plaintiffs' injuries, without any evidence introduced by Plaintiffs that a violation of § 20.105 was a substantial factor in causing Plaintiffs' injuries, any consideration of a violation of § 20.105 was irrelevant. The Third Circuit's holding *In re TMI,* does not mandate otherwise. In *In re TMI,* the Court stated that after a violation of a statute or regulation had been determined, Plaintiffs would have satisfied the first two elements of a negligence cause of action: (1) a legal duty requiring a Defendant to conform to a certain standard of conduct and (2) a failure to conform to that standard. However, as the Court continued, "Plaintiffs must still prove causation and damages before they may recover." *In re TMI* at 1118. Plaintiffs presented no evidence of any connection between their injuries and a violation of § 20.105. At the new trial, no evidence concerning violation of § 20.105 will be admitted and no jury instruction on § 20.105 as an applicable standard of care will be given.

## (5) Instructions as to 10 C.F.R. § 20.106.

■ Defendants allege that a new trial is required because the content of the Court's instructions to the jury regarding § 20.106 was error. Specifically, Defendants contend that by reading and submitting all of § 20.106 to the jury, the jury was misled and confused in that they were not instructed as to the regulation's correct application and were provided with inapplicable subsections.

I disagree with Defendants' assertions that the jury was misled by the inclusion of § 20.106(b) and (c). Although inclusion of the entire regulation might not have been necessary, any error in that regard is clearly harmless. Defendants argue that the inclusion of § 20.106(b) and (c) likely led the jury to adopt an ALARA (as low as reasonably achievable) standard when assessing Defendants' duty or standard of care. However, there is nothing in the record to justify such speculation. Not one witness in the case testified to an ALARA standard and Plaintiffs never alluded to such a standard. A new trial should not be granted for the reason that a regulation was correctly stated in the

Court's instructions, but one party speculates that the jury was likely confused by the inclusion of the entire regulation and where there is nothing in the record to support such speculation.

As to any failure to instruct the jury on the requirement of § 20.106 for annual averaging at the boundary, the language of the regulation adequately explains how determinations of concentration at the boundary are to be measured, *if the discharge is within a restricted area.* Defendants' counsel repeatedly brought this issue to the attention of the jury through direct examination of their own experts and cross-examination of Plaintiffs' experts. The jury had adequate information to make a determination as to whether § 20.106 was violated.

### (6) Concurrent Cause.

 Defendants next contend that a new trial must be granted due to the Court's erroneous charge on concurrent cause. Specifically, the instruction to which Defendants object is the following:

> "There may be more than one substantial factor in bringing about the harm suffered by the Plaintiff. When negligent conduct of two or more persons or entities contributes concurrently to an occurrence or incident, each of these persons or entities is fully responsible for the harm suffered by the Plaintiff regardless of relative extent to which each contributed to the harm. A cause is concurrent if it was operative at the moment of the incident, and acted with another cause as a substantial contributive factor in bringing about the harm.
>
> Where the negligent conduct of a Defendant combines with other circumstances and other forces to cause the harm suffered by the Plaintiff, the Defendant is responsible for the harm if his negligent conduct was a substantial contributive factor in bringing about the harm even if

the harm would have occurred without it."

Charge to Jury, p. 13.

On this issue, Defendants first contend that this case involved one theory of liability, that being that Plaintiffs were injured by radiation from the Apollo plant caused by one actor (Defendants), and that, therefore, the instruction was erroneous. Defendants also argue that including such an instruction was in error when Plaintiffs did not quantify the risk posed by the Defendants' acts or by other potential causes because absent such quantification, there is no way to gauge the "substantiality" of the potentially causative factor attributed to the Defendants. Finally, Defendants argue that the Court's instruction that the jury could find proximate cause where the Defendants' conduct "combines with other circumstances and/or forces in bringing about harm ..." invited the jury to impermissibly speculate as to whether that unquantified risk, combined with other, similarly unquantified risks from other or unknown sources, were sufficient to support liability. "Given the single focus of Plaintiffs' allegations, and the fact that Plaintiffs did not, in any way, attempt to quantify or otherwise establish any so-called concurring causes, the instructions on concurrent cause could only confuse and mislead the jury as to Plaintiffs' burden of proof on causation." Defendants' Memorandum, p. 72.

Plaintiffs response to this argument is that both Defendants were negligent in causing Plaintiffs' injuries and therefore, a concurrent causation charge was proper.

Since the jury was requested to make separate findings as to each Defendant and it is the Plaintiffs' theory that it was the negligent conduct of both of the Defendants that combined to cause the Plaintiffs' harm and not the combination of the Defendants' "singular" negligent conduct with other causes that resulted in the Plaintiffs' harm, I conclude that a concurrent cause instruction was appropriate and that its

inclusion in the jury instructions does not require a new trial.

Having so held, because neither Plaintiffs nor Defendants have presented a thorough analysis of this issue in their memoranda seeking and opposing a new trial and, specifically, because Defendants have not analyzed this issue based on Plaintiffs' theory that each Defendants' separate conduct was a substantial factor in causing Plaintiffs' injuries, I will accept further argument and briefing on this issue prior to the inception of the new trial, if either or both parties desires to pursue this issue further.

### (7) Testimony of Other Cancers.

The next issue Defendants raise concerns the propriety, or impropriety, of admission of Plaintiffs' testimony regarding other cancers in Apollo. Initially, my ruling was to allow some brief reference by Plaintiffs to others in the Apollo area who had suffered from cancer, and how this knowledge affected Plaintiffs. This evidence was to be admitted as relevant to Plaintiffs' claims of mental anguish. It was my intention to afford Plaintiffs the opportunity to prove mental anguish while at the same time keeping to a minimum the prejudice such testimony might bring to Defendants. This clearly is not what occurred.

A review of Plaintiffs' testimony demonstrates that highly prejudicial and often irrelevant testimony as to other cancers in Apollo was admitted into evidence at trial. As Defendants' counsel points out in its Memorandum on page 82, although such evidence might have some probative value as to Plaintiffs' mental anguish claim, no jury could "remain unaffected by that evidence on the issue of causation."

Additionally, Defendants' argument that Plaintiffs' claim for mental anguish was easily proven by much less prejudicial testimony is persuasive. Each Plaintiff's anguish about his/her own injury was and would have been sufficient to each Plaintiff's claim for mental anguish. The inclusion of the testimony was error and a new trial must be granted on this issue. I must add that Plaintiffs' counsel's leading questions and comments on this issue greatly exacerbated the prejudice to Defendants, even in light of the intent of my ruling as set forth above. No testimony of other cancers will be admitted at a new trial.

### (8) MUF, Liquid Waste Emissions and Employee Exposures.

The next area of concern to Defendants relates to the admission of evidence regarding material unaccounted for (MUF), liquid waste emissions and employee exposures. Defendants contend that none of this evidence was causally related to Plaintiffs' injuries and that, therefore, its admission requires a new trial. I disagree as to MUF and agree with Defendants as to liquid waste emissions and employee exposures. Since I have previously determined that any reference to violations of § 20.105 should not be included in a new trial, then evidence of liquid waste emissions can have no relevance. Moreover, any evidence of employee overexposures has no relevance to any claims made by Plaintiffs based on violations of § 20.106.

As to MUF, however, the admission of that evidence was relevant to Defendants' violation of § 20.106. Both Dr. Egilman and Mr. Franke testified that Defendants' inability to account for radioactive materials was, at least, partially attributable to such materials being emitted into the air. The evidence relating to MUF was, thus, relevant and admissible.

### (9) Consolidation.

Defendants also object to the consolidation of the eight (8) cases for trial. As the Defendants are well aware, the claims pending in this case exceed two hundred (200). Rule 42(a) of the Federal Rules of Civil Procedure states:

(a) Consolidation. When actions involving a common question of law or fact are pending before the court, it may order a

joint hearing or trial of any or all of the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

All of the Plaintiffs in this case have made claims involving common questions of law or fact. In every instance a Plaintiff must prove a violation of § 20.106. This determination, in itself, would be sufficient to support consolidation.

To agree with Defendants' arguments, it would be necessary to conclude that each claim must be tried separately, since Defendants have not alleged any *specific* prejudice as to this particular consolidation. I do not believe that such a procedure is necessary or mandated by the law or any principles of fairness. The consolidation was appropriate and an effective tool for case management as the claims involved common questions of law and fact and served judicial economy.

### (10) Bifurcation of Punitive Damage Claim.

 Defendants next argue that they are entitled to a new trial or, in the alternative, to remittitur due to the denial of Defendants' Motion to Bifurcate Plaintiffs' Punitive Damages Claim. I agree with Defendants that a new trial is warranted in which Plaintiffs' compensatory damage claims will be presented separately from Plaintiffs' punitive damage claims. I conclude now, upon review of the trial evidence, that, to avoid prejudice to Defendants, separate trials for compensatory damage and punitive damage claims should have been held.

There is no question that it would have been somewhat inconvenient for Plaintiffs to have presented proof for compensatory damages separately from proof for punitive damages, since several witnesses gave evidence relevant to both claims. Nevertheless, the prejudice suffered by Defendants as a result of the introduction of this evidence in the liability and compensatory damage phase of this case outweighed any inconvenience suffered by Plaintiffs.

I further agree with Defendants that the sequence of the trial may well have led the jury to conclude that any award they made to Plaintiffs should include not only what would compensate Plaintiffs, but also what might punish Defendants. As Defendants point out, there is no reason to believe that the jury did not place all the evidence of Defendants' wrongful conduct on the scale when determining whether Plaintiffs met their burden of proof on the issues of liability and compensatory damages. While it is true that the jury was not specifically instructed on the matter of punitive damages prior to their initial deliberations, they were told to consider all the evidence, some of which applied only to a punitive damage award. Therefore, at a new trial the Plaintiffs' punitive damages claims will be bifurcated.

### (11) Evidence of Plaintiffs' Halls' Mental Anguish.

 Defendants also allege that a new trial is necessary due to the admission of evidence relating to Mr. and Mrs. Hall's mental anguish. In light of the instructions to the jury that they were not permitted to award damages to the Halls for their pain and suffering or mental anguish under either the wrongful death or survival action claims, the admission of this evidence requires a new trial. Damages recoverable under the Pennsylvania Wrongful Death Act are limited to pecuniary losses the parents of a deceased child have sustained as a result of their child's death. *Kiser v. Schulte,* 538 Pa. 219, 648 A.2d 1, 4 (1994). The measure of damages that can be awarded in a survival action include, among other things, the *decedent's* pain and suffering. *Id.* at 4, 538 Pa. 219. No damages are awardable for the parents' anguish. Thus, any testimony concerning the Halls' mental anguish was irrelevant and highly prejudicial and will not be admitted at a new trial.

**(12) Plaintiffs' Counsels' "Pervasive Misconduct".**

Additionally, Defendants urge that Plaintiffs' counsel's pervasive misconduct throughout the trial requires a new trial. While I understand the basis for Defendants' counsel's frustration with Plaintiffs' counsel's conduct during the course of the trial, I cannot conclude, as Defendants do, that such conduct was "pervasive misconduct" requiring a new trial. Clearly, the style and courtroom demeanor brought to this trial by Plaintiffs' counsel on the one hand and Defendants' counsel on the other could not have been more different. Thus, it is not surprising to me that Defendants make this argument.

Having so held, I offer some direction to counsel for Plaintiffs as to conduct at a new trial:

1. Plaintiffs' counsel shall not express a personal opinion as to the justness of Plaintiffs' causes, as to the credibility of any witness or as to the culpability of any party, in accordance with Pa. Rule of Professional Conduct 3.4(c).

2. Plaintiffs' counsel shall refrain from asking leading questions to its own witnesses.

3. Plaintiffs' counsel shall refrain from "testifying" in their questioning of witnesses.

4. Plaintiffs' counsel shall not speculate on future cancers Plaintiffs might suffer.

Defendants' final, brief and conclusory argument that there are other grounds for judgment as a matter of law and for a new trial all raise issues previously considered in the *Motion for Summary Judgment* and *Motions in Limine*. The Motion for Summary Judgment is the subject of an Opinion previously issued and the Motions in Limine were decided pre-trial and reconsidered and explained in detail within.

There is no easy way to come to the conclusion to which I have come. The Plaintiffs have suffered great losses. Both Plaintiffs and Defendants have incurred considerable effort and expense. The emotional impact on everyone involved is, has been and will be considerable. Never-

theless, I can come to no other fair or just decision than to grant Defendants' Motion for a New Trial for the reasons set forth within.

### ORDER OF COURT

**AND NOW,** this **29th** day of June, 1999, for the reasons set forth in the Opinion accompanying this Order, Defendants' Motion for Judgment as a Matter of Law (Docket No. 335) is DENIED and Defendants' Alternative Motion for a New Trial (Docket No. 335) is GRANTED.